# IN UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CAUSE NO. 16-CR-1402-PRM** |
| | § | |
| **MARIA ISABEL MOLINA-ISIDORO,** | § | |
| | § | |
| **Defendant.** | § | |

## THE UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS

COMES NOW the Government by and through the undersigned Assistant United States Attorney and files this the Government's Opposition to Defendant's Motion to Suppress in the above entitled and numbered cause and would respectfully show as follows:

Defendant Maria Isabel Molina-Isidoro ("Molina") seeks to suppress, and to exclude from trial, the following evidence:

> (1) Any and all data obtained from her cell phone by law enforcement agents on or after July 12, 2016, and;

> (2) Any fruits of the search of her cell phone including her reaction and statements when questioned about texts on her cell phone.

Defendant requests suppression and argues that no exception to the warrant requirement applies in this circumstance because her cell phone was searched without a warrant or her consent. The Government asserts the search was lawful and falls within its plenary authority to conduct a warrantless search pursuant to the border search doctrine.

## I.     Facts And Procedural Background

On July 12, 2016, Molina attempted to enter the United States from Mexico on foot, using a pedestrian lane at the Bridge of the Americas Port of Entry in El Paso, Texas.  Molina is

a resident, citizen, and national of Mexico.

At the primary inspection lane, Molina placed her suitcase onto an x-ray machine for inspection. Customs and Border Protection ("CBP") Officer Laura Ortega performed an x-ray scan of the suitcase and detected anomalies. Molina's suitcase was selected for inspection and CBP Officer William Long removed the suitcase from the belt and began to question Molina. Molina claimed ownership of the suitcase and unlocked it for inspection, moreover, when asked if she had anything to declare, Molina responded in the negative, and stated she only had clothing in the suitcase.

Molina was referred to a secondary inspection area, where CBP Officer Homero Vega questioned Molina about her travel. Molina stated she delivered clothing that she had purchased for her brother to sell in Juarez, Mexico. Molina claimed ownership of the suitcase and stated she had purchased it in Tijuana, Mexico. Molina stated she had crossed with the suitcase on multiple occasions, with no problems. Finally, Molina stated she flew to El Paso, Texas, on July 12, and her plan was to cross back into the United States to fly back to Tijuana, Mexico, because it was "better and easier to fly in the United States."

CBP Officer Long opened Molina's suitcase and noticed modifications. Molina's suitcase was re-scanned through the x-ray, and the anomaly was located covered by electrical tape. CBP Officer Long discovered a hidden compartment, and extracted a white crystal substance that tested positive for the presence of methamphetamine. Additionally, a CBP Canine enforcement officer utilized a narcotics detecting dog, which alerted to a narcotic odor emitting from the suitcase. The weight of the methamphetamine was approximately 4.32 kilograms.

After discovering the methamphetamine, CBP Officers contacted Special Agents from the Department of Homeland Security. Special Agents Oscar Flores and Jesus DeAlba

responded to the Port of Entry. After being advised of her *Miranda*[1] rights by the agents, Molina affirmatively waived her rights and agreed to give the agents a statement without the benefit of counsel. *See Exhibit A.* Molina told the agents the suitcase belonged to her, and that she had no explanation for how drugs got into the suitcase. Molina stated there was no way someone could have loaded the drugs into her suitcase without her knowledge. Molina stated she flew into El Paso from San Diego and immediately took a taxi to Juarez to visit her brother. However, she could not provide the address in Mexico where her brother lived. Molina stated she did not see her brother because he knew she was coming, and that she merely needed to drop off clothing to his residence. Molina stated she was returning to El Paso because she was intending to fly back to Tijuana, Mexico, as she had to be at work on July 13, 2016, at 5:00 A.M. Molina advised she had not purchased tickets for this flight yet. Molina stated she spent approximately 40 minutes total in Mexico.

Agents then confronted Molina about her travel plans and work schedule. Specifically, Agents asked Molina why she needed to pack additional personal clothing if she only intended to stay in Mexico for 40 minutes and immediately fly back home for work. Molina had no response. Agents asked Molina to try and explain her story because to them it did not make sense, at which point Molina terminated the interview by requesting to speak with an attorney.

At this point Agents conducted a review of her phone, viewing the Uber and WhatsApp applications. When viewing the WhatsApp application, Agents observed, recorded, and translated the following exchange:[2]

Molina advised RAUL that she was headed to El Paso, and requested RAUL to

---

[1] 384 U.S. 436 (1966).

[2] The WhatsApp application is end-to-end encrypted and erases communication history; the only record of the conversation is the contemporaneous notes and subsequent reports prepared by Special Agents at the Port of Entry on the night of the arrest.

send her the information for the Uber. MOLINA advises RAUL that she had arrived in El Paso. RAUL responded that he sent her the information for the Uber. RAUL sent a picture f a credit card, front and back, and told MOLINA to use that credit card information to pay for Uber. RAUL sent information regarding a hotel located in Juarez, Mexico. RAUL directed MOLINA to Hotel Suites in Colonia Playas, Room #10, and advised MOLINA that the stuff is located there. MOLINA advised RAUL that she arrived to the room but no one was there. RAUL stated he will get a hold of them. MOLINA then responded that the guy was asleep and he opened the door. RAUL sent another picture of a Southwest Airlines flight itinerary. The itinerary listed MOLINA as the passenger of a flight departing El Paso at 5:15 P.M. with a final destination of Ft. Lauderdale, Florida. MOLINA advised RAUL that she got the stuff and was headed back to El Paso.

Subsequent to the cursory review of the phone, agents seized the phone and have maintained custody of the phone. *See Exhibit B.* To date, agents have not conducted a forensic analysis, or "dump," of the phone and all of its data.

On July 12, 2016, Molina was taken before United States Magistrate Judge Robert F. Castaneda for her initial appearance. Judge Castaneda set a preliminary and detention hearing for July 15, 2016, and upon the conclusion of the hearing, found probable cause and detained Molina without bond. A true bill of indictment was returned by a grand jury sitting in the Western District of Texas on August 10, 2016. Discovery was provided to defense counsel on August 25, 2016. Molina filed a motion to suppress on September 1, 2016, and the Government now timely responds.

## II. The Border Search Doctrine Gives The Government Plenary Authority To Conduct A Search Of Defendant's Cell Phone.

Molina argues that the texts found on her phone must be suppressed under *Riley v. California*[3] because the border search doctrine does not allow for the search of the her cell phone after contraband has been discovered. *See Motion to Suppress* at 5-6. However, the Government has plenary authority to conduct searches at the international border, this authority

---

[3] 134 S. Ct. 2473 (2014).

was not abrogated by *Riley*, and this authority plainly applies to the examination of Defendant's cell phone regardless of whether and at what time contraband was found.

## A. *Riley* Does Not Limit The Government's Authority To Conduct Searches Of Electronic Devices And Information Stored Locally On Those Devices At The International Border.

Contrary to Molina's argument, *Riley* does not limit the Government's search authority at the border. Instead, *Riley* is limited to ordinary searches incident to arrest where individual privacy rights outweigh the Government's interest in conducting warrantless searches of cell phones.[4] *Riley*, 134 S. Ct. at 2484. Under these circumstances, the Government must obtain a warrant to search a cell phone seized incident to an arrest. *Id.* at 2484. At the border, the balance between the Government's interests and individual rights is struck differently and much more in favor to the Government.

The Government's compelling interest in conducting searches at the border has been recognized "since the beginning of our Government," predating even the adoption of the Fourth Amendment. *United States v. Flores-Montano*, 541 U.S. 149, 153 (2004); *United States v. Ramsey*, 431 U.S. 606, 616-619 (1977). The need for such searches stems from "[t]he Government's interest in preventing the entry of unwanted persons and effects" into the United States, an interest that is "at its zenith" at the border. *Flores-Montano*, 541 U.S. at 152.

The authority to conduct warrantless border searches advances the United States' "inherent authority" and "paramount interest" in protecting its "territorial integrity." *Id.* at 153; *see also United States v. Ickes*, 393 F.3d 501, 506 (4th Cir. 2005) (characterizing the

---

[4] The Court explained that the interest in protecting the officer's safety did not justify dispensing with the warrant requirement because digital data stored on the phone could not itself be used as a weapon to harm officers or effectuate an arrestees' escape. *Riley*, 134 S. Ct. at 2485. Nor did the interest in preventing destruction of evidence justify dispensing with the warrant requirement. *Id.* at 2486.

Government's interest as "overriding"). This substantially elevated Government interest renders "the Fourth Amendment's balance of reasonableness . . . qualitatively different at the international border than in the interior." *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985). Allowing the search of cell phones at the border, even after *Riley*, reflects only that which "[b]oth Congress and the Supreme Court have made clear": "extensive searches at the border are permitted, even if the same search elsewhere would not be." *Ickes*, 393 F.3d at 502; *see United States v. Saboonchi*, 2014 WL 3741141, at *3-*5 (D. Md. July 28, 2014) (recognizing that "Riley did not diminish the Government's interests in protecting the border or the scope of the border search exception").

Although *Riley* was based in part on the Supreme Court's determination that the search of a cell phone is not closely tied to the historical justifications for searches incident to arrest, *Riley*, 134 S. Ct. at 2484-88, the ability to conduct searches of electronic devices at the border is central to the Government's interest in combating terrorism, preventing crime from occurring in the United States, preventing persons who intend to commit crime from entering the United States, and preventing the movement of certain materials across the border. Indeed, the rationale behind the border search doctrine "has its origins in national self-protection, and it is a necessary instrument to protect our sovereignty." *United States v. Seljan*, 547 F.3d 993, 1009 (9th Cir. 2008) (concurrence). "At perhaps no other time in our nation's history are border searches as vital to maintaining national security." *Id*. Requiring reasonable suspicion for searches of electronic devices at the border would exact a significant toll on law enforcement interests.

Balanced against this compelling Government interest is a traveler's diminished expectation of privacy at the border. International travelers know that, by virtue of their

voluntary decision to present themselves for entry into the United States, they are subject to the Government's plenary search authority. *See, e.g., Ramsey*, 431 U.S. at 623 n.17; 5 Wayne R. LaFave, Search & Seizure § 10.5(a) at 232 (5th ed. 2012) ("[S]ince the individual crossing a border is on notice that certain types of searches are likely to be made, his privacy is less invaded by those searches.") (internal quotation marks omitted). Knowing this, travelers have options: a traveler can choose to not bring certain possessions with him into the United States, such as a laptop, a personal smartphone or a tablet, or the traveler can choose to erase data from those devices. *See id.* ("The individual traveler determines the time and place of the search by his own actions, and he thus has ample opportunity to diminish the impact of that search by limiting the nature and character of the effects which he brings with him.").

**B.      The Government's Plenary Authority To Conduct A Search At The Border Is Not Limited To Contraband.**

Numerous courts have held that the border search doctrine is not limited to the search and seizure of contraband. For example, in *United States v. Schoor*, 597 F.2d 1303 (9th Cir. 1979), the court stated:

> We recognize that the primary purpose of a border search is to seize contraband property unlawfully imported or brought into the United States (citations omitted). However, where customs officers are authorized to search for material subject to duty or otherwise introduced illegally into the United States and they discover instrumentalities or evidence of crimes, they may seize the same.

*Schoor*, 597 F.2d at 1306 (holding that a search and seizure of air cargo bills, which are not contraband, is lawful under the border search doctrine because they are instrumentalities of a crime involving the illegal importation of drugs).[5] Likewise, in *United States v. Romm*, 455 F.3d

---

[5] Significantly, *Schoor* is still good law, even after *Cotterman*. In *United States v. Cotterman*, 709 F.3d 952 (9th Cir. 2013) *cert. denied*, 134 S. Ct. 899 (2014) *reh'g denied*, 134 S. Ct. 1512 (2014), the court held that a forensic search of an electronic device is a "non-routine" search and therefore requires some quantum of suspicion to justify the search. *See Cotterman*, 709 F.3d at

990 (9th Cir. 2006), the court explained, "the border search doctrine is not limited to those cases where the searching officers have reason to suspect the entrant may be carrying foreign contraband. Instead, 'searches made at the border... are reasonable simply by virtue of the fact that they occur at the border.'" *Id*. at 997. Notably, in *Romm*, the defendant had been detained abroad and presumably had no opportunity to obtain foreign contraband, nevertheless the court upheld the search of his computer under the border search doctrine. *Id*.

The Fifth Circuit Court of Appeals has also applied the border search doctrine to non-contraband. In *United States v. Berisha*, the Court applied the border search doctrine to affirm the search of outbound travelers who possessed in excess of $10,000 and were thus guilty of failing to report that cash. *United States v. Berisha*, 925 F.2d 791, 795 (5th Cir. 1991). To support that decision, the Circuit Court found the Government still retained a national interest in regulating the exportation of domestic currency. *Id*. It logically follows from *Berisha* that the border search doctrine does not apply solely to contraband if currency in excess of $10,000 is not contraband per se, but is nevertheless evidence of a crime.

Other Circuits have likewise applied the border search doctrine to non-contraband cases. *See United States v. Gurr*, 471 F.3d 144 (D.C. Cir. 2006). In that case, customs officials were aware that a bank manager had pending fraud charges, and therefore searched and seized his luggage at an airport without a warrant. *Id*. at 147. The luggage contained financial documents which the officials examined. The bank manager argued that the targeted search and seizure of his documents – as opposed to contraband – exceeded the government's powers at the border. *Id*. at 146-47. Specifically, the bank manager argued the search was illegal, and was a "fishing expedition," because the officials knew of the pending charges, but had no suspicion that his

---

962-4. Of course, in this case no forensic search of the phone was performed.

luggage contained contraband. *Id*. at 148. In denying the bank manager's motion to suppress, the D.C. court relied upon the border search doctrine and found that the defendant "misstate[ed] the law in arguing that no case suggests that customs officials may seize something that they do not know to be contraband." *Id*. at 149. It thus rejected "the distinction [the defendant] would draw between contraband and documentary evidence of a crime" as "without legal basis." *Id.*

The fact that the methamphetamine was discovered before the Molina's was examined is also not determinative; the officers could still examine the phone for evidence under the border search doctrine. Nevertheless, precedent supports the conclusion that agents are permitted, under the broad aegis of the border search doctrine, to look for these items. *See Gurr*, 471 F.3d at 149. In contrast, *Riley* stands for the proposition that electronic data on a cell phone does not pose a danger to law enforcement officers—an issue not implicated by the facts of this case. *Riley*, 134 S. Ct. at 2485. Simply stated, the border search exception does not touch upon the Fourth Amendment concerns addressed by the *Riley* court.

### C. The Search Of The Phone Was A Routine Search That Did Not Require Reasonable Suspicion, Probable Cause, Or A Warrant.

Molina implicitly argues that the search of her cell phone at the border was not a routine search, and instead was a search that required a warrant or probable cause. As this Court has previously explained, a 'routine' search is one that does not seriously invade a traveler's privacy at the international border. *United States. v. McAuley*, 563 F.Supp.2d 672, 676 (2008) *citing United States v. Roberts*, 274 F.3d 1007, 1011 (5th Cir.2001). Government agents are therefore permitted to conduct "routine searches" without a warrant or probable cause. *United State v. Rivas*, 157 F.3d 364, 367 (5th Cir.1998). "In evaluating whether a search is routine, the key variable is the invasion of the privacy and dignity of the individual." *United States v. Kelly*, 302 F.3d 291, 294 (5th Cir.2002). The Fifth Circuit has "previously determined that ordinary pat-

downs or frisks, removal of outer garments or shoes, and emptying of pockets, wallets, or purses are all routine searches." *Id*.

In fact, the Supreme Court has rejected lower court decisions limiting the Government's plenary border search authority. *See, e.g., Flores-Montano*, 541 U.S. at 150 (overturning Ninth Circuit decision requiring reasonable suspicion to conduct a border search of an automobile gas tank); *Ramsey*, 431 U.S. at 607-608, 620-624 (reversing D.C. Circuit decision requiring probable cause and a warrant before opening international mail). With respect to electronic devices, this Court has previously held that searches of such devices are generally routine searches. *See McAuley*, 563 F.Supp.2d at 677 (finding that a search of the defendant's password protected computer at the border was a routine search and did not require reasonable suspicion). Other courts have held similarly. *See United States v. Verma,* 2010 WL 1427261 (S.D. Tex. Apr. 8, 2010) (forensic search of the defendant's computer and external drives at a border stop, which did not invade the defendant's body or damage his computer, was a routine search, and thus constitutional).

In this case the search of Defendant's cell phone was routine but, in any event, Defendant's expectation of privacy was significantly lowered by her presence at the international border. Nor was the search destructive or offensive, as the phone was not harmed or damaged in any way in the course of the Agents extremely short examination.

Furthermore, this was not a forensic search. *Cf. Saboonchi*, 2014 WL 3741141, at *1, *5 (holding that a forensic search of a cell phone constituted a non-routine search requiring reasonable suspicion but also that *Riley* did not diminish the scope of the border search exception). No digital copy of the phone was made during the search, nor was the data on the phone analyzed with specialized software. The phone was already on and the text messages

were merely read. This search was thus a routine search. *See McAuley*, 563 F.Supp.2d at 677.

**D.     Alternatively, A Border Search of Defendant Molina's Cell Phone Was Supported By A Reasonable Suspicion.**

However, even if the exam was non-routine, the search would still be constitutional. A warrantless non-routine border search requires a reasonable suspicion of wrongdoing to be constitutional. *Rivas*, 157 F.3d at 367.   Government agents may conduct non-routine warrantless searches at the border, but only if they reasonably suspect criminal activity based upon specific facts which, taken together with rational inferences therefrom, reasonably warrant a search.  *Id.*

Here, the agents had the requisite particularized and objective basis for suspecting Molina of criminal activity.  CBP Officers discovered methamphetamine in the suitcase Molina claimed ownership of.   Under questioning from Agents, Molina could not explain critical portions of her travel story.  Under these circumstances, it was not unreasonable for the Agents to suspect that Molina may be in contact with drug smugglers and to search her phone.  Based on the reasonable suspicion standard, the Supreme Court has upheld far more intrusive measures than the search of Molina's phone.  *See Montoya de Hernandez*, 473 U.S. at 541 (discussing the prolonged detention of a person suspected of carrying drugs inside her body, "We hold that the detention of a traveler at the border, beyond the scope of a routine customs search and inspection, is justified at its inception if customs agents, considering all the facts surrounding the traveler and her trip, reasonably suspect that the traveler is smuggling contraband in her alimentary canal.").

**E.     Suppression Is Unwarranted Under The Good Faith Exception.**

Molina's motion admittedly relies on the "dicta" in *United States v. Caballero*, for the proposition that once arrested at a border, agents in theory have time to obtain a search warrant. What Molina's motion fails to address is the actual holding of *Caballero*.  Specifically, the court

in *Caballero* noted that the good faith exception would "certainly apply," and the exclusionary rule would not apply, and reasoned:

> "[a]t the time of this search, officers had binding appellant precedent upon which they reasonably and in good faith could have relied to manually search [Caballero's] cell phone. There was no binding precedent that extended *Riley*'s search-incident-to-arrest decision to the milieu of international border enforcement. Thus, the law enforcement officers in Caballero's case could not have known that a manual search of a cell phone post-arrest would run afoul of the Fourth Amendment. The "good faith" inquiry is "whether a reasonably well trained officer would have known that the search was illegal in light of all the circumstances." *Herring*, 555 U.S. at 145, 129 S.Ct. 695 (quoting *United States v. Leon*, 468 U.S. 897, 922 & n. 23, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)).
>
> …Assuming, without deciding, that *Riley* trumps the border search exception, it would be illogical to find that if two trained jurists did not find that *Riley* trumps the border search exception, that law enforcement officers should know otherwise.
>
> Because a reasonably well-trained federal officer at our international border would not have known that searching Caballero's cell phone was illegal under the circumstances, the good faith exception would certainly apply. Because the good faith exception would apply, the exclusionary rule would not apply."

*United States v. Caballero*, No. 15CR2738, 2016 WL 1546731, at *8–9 (S.D. Cal. Apr. 14, 2016). The purpose of the exclusionary rule is to deter future Fourth Amendment violations, not to remedy past ones. *Davis v. United States*, 131 S. Ct. 2419, 2426 (2011). The Supreme Court has emphasized that "the exclusionary rule is not an individual right and applies only where it 'result[s] in appreciable deterrence.'" *Herring v. United States*, 555 U.S. 135, 141 (2009) (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984)). Because suppression imposes a "costly toll upon truth-seeking and law enforcement objectives" by "letting guilty and possibly dangerous defendants go free," a court must find that "the benefits of deterrence.... outweigh the costs" before excluding evidence obtained in violation of the Fourth Amendment. *Id.* (quotation marks omitted); *Davis,* 131 S. Ct. at 2427 ("For exclusion to be appropriate, the deterrence

benefits of suppression must outweigh its heavy costs…Our cases hold that society must swallow this bitter pill when necessary, but only as a 'last resort.'").

"To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring*, 555 U.S. at 144. Suppression may therefore be warranted "to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Id.; Davis*, 131 S. Ct. at 2427. "But when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way." *Davis*, 131 S. Ct. at 2427-2428 (internal citations and quotation marks omitted).

Although the Supreme Court did not address in *Davis* whether the good-faith exception applies in the absence of binding appellate precedent that governed the officer's actions, the requirement that officers needed probable cause and a warrant before searching Molina's phone would be a new departure from prevailing case law. The law regarding searches on the border involves discussions ranging from suspicionless searches to searches that require reasonable suspicion, not probable cause or a warrant. While *Riley* protected the privacy of cell phones in the interior United States, the *Riley* court did not discuss the border search doctrine, or the level of suspicion required for a search at the border. As explained, the purpose of the exclusionary rule is to deter deliberate, reckless, and grossly or systematically negligent police conduct; it does not apply "when the police act with an objectively reasonable good-faith belief that their conduct is lawful." *Davis*, 131 S. Ct. at 2427 (citation omitted).

Every proposed application of the exclusionary rule requires a "rigorous weighing of . . .

costs and deterrence benefits," *Davis*, 131 S. Ct. at 2427, and suppression is appropriate "only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment," *Leon*, 468 U.S. at 919 (quoting *United States v. Peltier*, 422 U.S. 531, 542 (1975)); *see Katzin*, 769 F.3d at 185 (holding that a reasonable officer may "correctly conclude, based upon a panoply of non-binding authority establishing a 'constitutional norm,' that a particular police practice does not violate the Fourth Amendment") (citation omitted).

Here, officers were confronted with a situation where an individual was attempting to enter the United States with over four kilograms of methamphetamine. Molina claimed she had no idea how the drugs made it into her suitcase. At which point Molina's travel story unraveled. Based on the prevailing case law regarding the border search doctrine and the suspicious responses to their questions, Agents decided to search the phone. That search was made with the objectively reasonable good-faith belief that the search of Molina's cell phone was lawful and suppression would be unwarranted.

## III.    Conclusion

Agents lawfully searched Molina's cell phone. Thus, this court should deny Molina's Motion. While there are some factual discrepancies between the parties, there are no facts of consequence that are in controversy. The Government requests that the Court make a ruling based on the motions of the parties.

Respectfully submitted,

RICHARD L. DURBIN, JR.
UNITED STATES ATTORNEY


BY: /s/
ROBERT J. WHITE
Assistant U.S. Attorney
Illinois Bar #6304282
700 E. San Antonio, Suite 200
El Paso, Texas 79901
(915) 534-6884


## CERTIFICATE OF SERVICE

I hereby certify that on this the 9th day of September, 2016, a true and correct copy of the foregoing instrument was electronically filed with the Clerk of the Court using the CM/ECF System which will transmit notification of such filing to the following CM/ECF participant: Louis E. Lopez.

/s/
ROBERT J. WHITE
Assistant U.S. Attorney

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CAUSE NO. 16-CR-1402-PRM** |
| | § | |
| **MARIA ISABEL MOLINA-ISIDORO,** | § | |
| | § | |
| **Defendant.** | § | |

<u>ORDER</u>

On this date, came on to be considered the Defendant's Motion to Suppress in the above entitled numbered cause. The Court having considered the same, is of the opinion that said Motion should be denied.

IT IS THEREFORE ORDERED that the Defendant's Motion to Suppress be DENIED.

SIGNED and ENTERED this _____ day of _____, 2016.


_____
HON. PHILIP R. MARTINEZ
UNITED STATES DISTRICT JUDGE