IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § § | |
| v. | § § | EP-16-CR-1402-PRM |
| MARIA ISABEL MOLINA-ISIDORO, | § § § | |
| Defendant. | § | |

## <u>ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS</u>

On this day, the Court considered Defendant Maria Isabel Molina-Isidoro's ("Molina") "Motion to Suppress and Memorandum in Support" (ECF No. 16) [hereinafter "Motion"], filed on September 2, 2016; the United States' (the "Government") "Opposition to Defendant's Motion to Suppress" (ECF No. 17) [hereinafter "Response"], filed on September 2, 2016; and the parties' "Joint Stipulation of Facts" (ECF No. 21) [hereinafter "Joint Stipulation"], filed on September 21, 2016, in the above-captioned cause.  In her Motion, Molina asks the Court to "suppress and exclude from the Government's case-in-chief, any and all evidence obtained as a result of a search of her cell phone," which was conducted at the border.  Mot. 1.

The facts surrounding the search of Molina's cell phone, and for the purpose of adjudicating her Motion, are undisputed, set forth in the parties' Joint Stipulation, and recounted verbatim below.[1] After reviewing the Joint Stipulation and arguments proffered by the parties, the Court is of the opinion that Molina's Motion should be denied for the reasons that follow.

---

[1] Molina initially provided a factual summary in her Motion but maintained that it was "necessarily assembled primarily from Government reports" and stated that she did "not necessarily stipulate to their accuracy." Mot. 1. Molina also requested an evidentiary hearing to determine the issues of fact presented in her Motion. *Id.* However, counsel for Molina subsequently informed the Court at a docket call on Molina's case that a hearing would not be necessary. Shortly thereafter, the Government and Molina submitted their Joint Stipulation. Consequently, the Court is of the opinion that a hearing is unnecessary to resolve Molina's Motion because the facts are undisputed and the Court can adjudicate the issues as a matter of law. *See United States v. Guerra*, 605 F. App'x, 295, 296 (5th Cir. 2015) ("Suppression hearings are required 'only when necessary to receive evidence on an issue of fact . . . .'") (internal quotation marks and citations omitted); *see also United States v. Law*, 528 F.3d 888, 904 (D.C. Cir. 2008) ("[A] defendant's presence is not required if the court can decide the suppression as a matter of law. Accordingly, the viability of . . . [the defendant's] claim[ ] [that he has] the right to an evidentiary hearing . . . turns on whether the district court needed to resolve any disputes of material fact to decide [the defendant's] suppression motion.").

## I.   STIPULATED FACTS

"On July 12, 2016, Molina attempted to enter the United States from Mexico on foot, using a pedestrian lane at the Bridge of the Americas Port of Entry in El Paso, Texas.  Molina is a resident, citizen, and national of Mexico.

"At the primary inspection lane, Molina placed her suitcase onto an x-ray machine for inspection.  Customs and Border Protection ('CBP') Officer Laura Ortega performed an x-ray scan of the suitcase and detected anomalies.  Molina's suitcase was selected for inspection and CBP Officer William Long removed the suitcase from the belt and began to question Molina.  Molina claimed ownership of the suitcase and unlocked it for inspection[;] moreover, when asked if she had anything to declare, Molina responded in the negative, and stated she only had clothing in the suitcase.

"Molina was referred to a secondary inspection area, where CBP Officer Homero Vega questioned Molina about her travel.  Molina stated she was coming from her brother's house in Juarez, Mexico. Molina stated she delivered clothing that she had purchased for her

3

brother to sell in Juarez, Mexico. Molina claimed ownership of the suitcase and stated she had purchased it in Tijuana, Mexico. Molina stated she had crossed with the suitcase on multiple occasions, with no problems. Finally, Molina stated she flew to El Paso, Texas, on July 12, and her plan was to cross back into the United States to fly back to Tijuana, Mexico, because it was 'better and easier to fly in the United States.'

"CBP Officer Long opened Molina's suitcase and noticed modifications. Molina's suitcase was re-scanned through the x-ray, and the anomaly was located covered by electrical tape. CBP Officer Long discovered a hidden compartment, and extracted a white crystal substance that tested positive for the presence of methamphetamine. Additionally, a CBP Canine enforcement officer utilized a narcotics detecting dog, which alerted to a narcotic odor emitting from the suitcase. The weight of the methamphetamine was approximately 4.32 kilograms.

"After discovering the methamphetamine, CBP Officers contacted Special Agents from the Department of Homeland Security. Special

4

Agents Oscar Flores and Jesus DeAlba responded to the Port of Entry. After being advised of her Miranda rights by the agents, Molina affirmatively waived her rights and agreed to give the agents a statement without the benefit of counsel.  Molina told the agents the suitcase belonged to her, and that she had no explanation for how drugs got into the suitcase.  Molina stated there was no way someone could have loaded the drugs into her suitcase without her knowledge.

"Molina stated she flew into El Paso from San Diego and immediately took a taxi to Juarez to visit her brother.  However, she could not provide the address in Mexico where her brother lived. Molina stated she did not see her brother because he knew she was coming, and that she merely needed to drop off clothing to his residence. Molina stated she was returning to El Paso because she was intending to fly back to Tijuana, Mexico, and she had to be at work on July 13, 2016, at 5:00 A.M.  Molina advised that she had not purchased tickets for this flight yet.  Molina stated she spent approximately 40 minutes total in Mexico.

"Agents then confronted Molina about her travel plans and work schedule.  Specifically, Agents asked Molina why she needed to pack additional personal clothing if she only intended to stay in Mexico for 40 minutes and immediately fly back home for work.  Molina had no response.  Agents asked Molina to try and explain her story because, to them, it did not make sense, at which point Molina terminated the interview by requesting to speak with an attorney.

"At this point Agents conducted a review of her phone, viewing the Uber and WhatsApp applications.  Agents did not ask for, nor receive consent from Molina to search her phone.  When viewing the WhatsApp[2] application, Agents observed, recorded, and translated the following exchange:

> Molina advised RAUL that she was headed to El Paso, and requested RAUL to send her the information for the Uber. MOLINA advise[d] RAUL that she had arrived in El Paso. RAUL responded that he sent her the information for the Uber.  RAUL sent a picture [o]f a credit card, front and back, and told MOLINA to use that credit card information to pay

---

[2] The WhatsApp application is end-to-end encrypted and erases communication history; the only record of the conversation is the contemporaneous notes and subsequent reports prepared by Special Agents at the Port of Entry on the night of the arrest.

6

for Uber.  RAUL sent information regarding a hotel located
in Juarez, Mexico.  RAUL directed MOLINA to Hotel Suites
in Colonia Playas, Room #10, and advised MOLINA that the
stuff is located there.  MOLINA advised RAUL that she
arrived to the room but no one was there.  RAUL stated he
w[ould] get a hold of them.  MOLINA then responded that
the guy was asleep and he opened the door.  RAUL sent
another picture of a Southwest Airlines flight itinerary.  The
itinerary listed MOLINA as the passenger of a flight
departing El Paso at 5:15 P.M. with a final destination of
Ft. Lauderdale, Florida.  MOLINA advised RAUL that she
got the stuff and was headed back to El Paso.

"Subsequent to the cursory review of the pone, agents seized the

phone and have maintained custody of the phone.  To date, agents have

not conducted a forensic analysis, or 'dump,' of the phone and all of its

data."  Joint Stip. 1–4.

## II.   LEGAL STANDARD

The Fourth Amendment provides that "[t]he right of the people to

be secure in their persons . . . and effects against unreasonable searches

and seizures, shall not be violated, and no Warrants shall issue but

upon probable cause."  U.S. Const. amend. IV.  "As the text makes clear,

the ultimate touchstone of the Fourth Amendment is reasonableness."

*Riley v. California*, 134 S. Ct. 2473, 2482 (2014) (internal quotation

marks and citations omitted).  The Supreme Court has determined that

"where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing . . . reasonableness generally requires the obtaining of a judicial warrant." *Id.* (quoting *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 653 (1995)). "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *Id.*; *see also United States v. Pickett*, 598 F.3d 231, 234 (5th Cir. 2010).

"The border search is one such exception, and it has a 'history as old as the fourth amendment itself.'" *Pickett*, 598 F.3d at 234 (quoting *United States v. Ramsey*, 431 U.S. 606, 619 (1977)); *see also United States v. Newell*, 506 F.2d 401, 404 (5th Cir. 1975) ("The so-called border search has long been recognized as an exception to both the warrant and probable cause requirements of the Fourth Amendment to the Constitution."). Supreme Court jurisprudence on this border search exception demonstrates that it is predicated upon "[t]he Government's interest in preventing the entry of unwanted persons and effects," which "is at its zenith at the international border." *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004).

8

"Congress, since the beginning of our Government, 'has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country.'" *Id.* (quoting *United States v. Montoya de Hernandez*, 473 U.S. 536, 537 (1985)). "Historically, such broad powers have been necessary to prevent smuggling and to prevent prohibited articles from entry." *Ramsey*, 431 U.S. at 619. "Time and again, [the Supreme Court has stated] that searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border." *Flores-Montano*, 541 U.S. at 152–53. This is because there is a "longstanding concern for the protection of the integrity of the border." *Montoya de Hernandez*, 437 U.S. at 538. In sum, "[i]t is axiomatic that the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity." *Flores-Montano*, 541 U.S. at 153.

9

"Balanced against the sovereign's interests at the border are the Fourth Amendment rights of [an individual.]" *Montoya de Hernandez*, 473 U.S. at 539.  However, "[c]onsistently . . . with Congress' power to protect the Nation by stopping and examining persons entering the country, the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior." *Montoya de Hernandez*, 437 U.S. at 538.  "[N]ot only is the expectation of privacy less at the border than in the interior, the Fourth Amendment balance between the interests of the Government and the privacy rights of the individual is also struck *much more favorable* to the Government at the border."  *Id.* at 539–40 (emphasis added).

## III.  ANALYSIS

In her Motion, Molina seeks to suppress the evidence that CBP officers retrieved from her cell phone, including the officer's observations and any statements she made at the time of, or shortly after the discovery of the text messages, under the exclusionary rule. Mot. 4–5.  Namely, Molina argues that this evidence is fruit of the illegal search of her cell phone based on the Supreme Court case of

10

*Riley v. California*, 134 S. Ct. 2473 (2015). *Id.* at 5. The Court finds that *Riley* did not disturb the well-recognized border search exception. Consequently, the Court holds that the CBP Officer's preliminary search of her cell phone was reasonable and did not violate her Fourth Amendment rights for the following reasons.

At first blush, *Riley* seems to be especially pertinent here because it involved the warrantless search of the defendant's cell phone incident to his lawful arrest. *See* 134 S. Ct. at 2480. In *Riley*, the Supreme Court was tasked with determining whether the search incident to arrest exception to the warrant requirement applied to the search of a defendant's cell phone. *Id.* at 2484 ("These cases require us to decide how the search incident to arrest doctrine applies to modern cell phones, which are now such a pervasive and insistent part of daily life . . . .").

After analyzing the search incident to arrest exception in detail, including the government interests justifying the exception, the

11

Supreme Court "decline[d] to extend *Robinson*[3] to searches of data on cell phones and hold instead that officers must generally secure a warrant before conducting such a search." *Id.* at 2485; *see also id.* at 2495 ("Our answer to the question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple—get a warrant." ).

Thus, while *Riley* extensively analyzed the complexities inherent in searching an individual's cell phone because "[m]odern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a . . . wallet, or a purse," the Supreme Court limited its holding to the search incident to arrest exception. *Id.* at 2488–89, 2494. Specifically, the Supreme Court made clear that "even though the search incident to arrest exception does not apply to cell phones, *other case-specific exceptions* may still justify a warrantless search of a particular phone." *Id.* at 2494 (emphasis added). Although not explicitly named, the border search exception may be one of those

---

[3] *United States v. Robinson*, 414 U.S. 218 (1973), articulated the search incident to arrest exception to the warrant requirement. *See Riley*, 134 S. Ct. at 2484 ("Such a balancing of interests supported the search incident to arrest exception in *Robinson*.").

exceptions that still justifies a warrantless search of a cell phone. *See United States v. Saboonchi*, 48 F. Supp. 3d 815, 817 (D. Md. 2014) ("The border search exception is one such case-specific exception.") (analyzing *Riley*).

The Court notes that neither the Supreme Court nor the Fifth Circuit Court of Appeals have ruled on the issue presently before the Court: whether *Riley* extends to searches of cell phones conducted on the border, or whether the border search exception continues to apply.[4]

While the Fifth Circuit has not addressed whether *Riley* applies to the border, it has analyzed *Riley* in a different context, and this analysis is instructive. Namely, in *United States v. Guerrero*, the Fifth Circuit analyzed whether *Riley* was an intervening change in the law that required it to depart from its previous holding regarding the collection of historical cell site location data. 768 F.3d 351, 359 (5th Cir. 2014).

---

[4] However, this precise issue is currently on appeal before the Fifth Circuit after a sister district court in the Western District of Texas, Del Rio Division, found that *Riley* does not extend to searches of cell phones at the border. *See United States v. Escarcega*, No. 24, 4:15–CR–275 (W.D. Tex. July 29, 2015), *appeal docketed*, No. 15-51090 (5th Cir. Nov. 18, 2015).

In *Guerrero*, the Government used historical cell site location data to roughly indicate the defendant's, or at least his cell phone's, location on the date an individual he was accused of murdering was killed. *Id.* at 357. Historical cell site location data reveals "the antenna tower and sector to which the cell phone sends its signal," and is "only available from third party communication providers." *Id.* at 358. Congress has enacted a statute governing the procedure that the Government must follow to obtain the data—the Stored Communications Act. *Id.* at 358 (citing 18 U.S.C. § 2703(d)). In *Guerrero's* case, the Government did not follow this procedure. *Id.* Thus, the defendant ultimately argued that the historical cell site data should have been suppressed. *Id.* at 357.

The Fifth Circuit noted that suppression is not a remedy for violation of the Stored Communications Act. Rather, the defendant would have to establish that the Government's actions in obtaining the data violated his Fourth Amendment rights to secure exclusion of the data. *Id.* at 358. The Fifth Circuit further explained that it had already ruled on this issue in a previous case—*In re Application of the United States for Historical Cell Site Data*—and held that an individual

14

does not have a Fourth Amendment privacy interest in historical cell site location data. *Id.* at 359 (citing 724 F.3d 600, 612, 615 (5th Cir. 2014)). The defendant argued that *Riley* was an intervening change in the law that required the Fifth Circuit to depart from its holding in *Historical Cell Site. Id.*

The Fifth Circuit rejected the defendant's argument and held that *Riley* did not affect *Historical Cell Site. Id.* Particularly relevant for the Court's analysis in the present case, is the Fifth Circuit's rationale for rejecting the defendant's argument:

> "[F]or a Supreme Court decision to change our Circuit's law, it 'must be more than merely illuminating with respect to the case before [the court] and must unequivocally overrule prior precedent. *Riley* does not unequivocally overrule *Historical Cell Site* . . . . Although the issues in *Riley* and in *Historical Cell Site* implicate a broader theme concerning the application of the Fourth Amendment to modern technology, they involve distinct doctrinal areas . . . . This is not to say that the Supreme Court may not reconsider the third party doctrine in the context of historical cell site data or some other new technology.

*Id.* at 359–60.

Although there is no Fifth Circuit precedent regarding border searches of technology—such as cell phones— the Fifth Circuit, along

with the Supreme Court, has long recognized the border search exception to the warrant requirement. Consequently, the Fifth Circuit's rationale in declining to overrule *Historical Cell Site* is also applicable to the present situation. The border search exception and the search incident to arrest exception are two distinct doctrinal areas of law. *See id.*; *see also Saboonchi*, 48 F. Supp.3d at 818.[5] Applying this principle to the analogous situation at hand, the Court finds that *Riley* did not "unequivocally overrule" the border search exception when it pertains to cell phones. *See Guerrero*, 768 F.3d at 359–60.

After reviewing the *Riley* decision, the Court cannot say that it has any application beyond the limited search incident to arrest

---

[5] Notably the *Saboonchi* court concisely and accurately articulates this point:

> "Defendant argues that the traditional exception to the warrant requirement for searches occurring at the border has no more application to the search of Mr. Saboonchi's iPhone than the exception for searches incident to arrest had in *Riley*. This sweeping statement might have merit if the search incident to arrest and border search exceptions had the same purpose, were evaluated the same way, or were treated similarly under the law. But that is not the case."

*Sabonchi*, 48 F. Supp.3d at 818.

16

exception—especially in light of the Supreme Court's admonition that other case-specific exceptions to the warrant requirement may still justify the warrantless search of a cell phone. *See Riley*, 134 S. Ct. at 2494. The Fifth Circuit's recognition that "constitutional issues should be decided on the most narrow, limited basis" also lends credence to the Court's interpretation of the *Riley* decision and the limited applicability of its holding. *See United States v. Roberts*, 274 F.3d 1007, 1012 (5th Cir. 2001) (citing *Dall. Joint Stock Land Bank v. Davis*, 83 F.2d 322, 323 (5th Cir. 1936) ("[I]t is a settled rule in the federal courts that questions of constitutional law . . . will be decided only where a present necessity for such decision exists, and then only no more broadly than the precise situation in question requires.")).

Indeed, the Court is not alone in reaching this conclusion; several other district courts analyzing the same issue have reached the same conclusion. *See, e.g.*, *United States v. Ramos*, No. 16CR467 JM, 2016 WL 3552140, at *7–8 (S.D. Cal. June 3, 2016) ("First, it is important to recognize that [*Riley's*] holding did not modify or undercut the paradigmatic border search exception."); *United States v. Kolsuz*, No. 1:

17

16-CR-53, 2016 WL 2658156, at *11 (E.D. Va. May 5, 2016) ("Thus,

although the Supreme Court's decision in *Riley* appears to indicate that

cell phones deserve the highest level of Fourth Amendment protection

available, the highest protection available for a border search is

reasonable suspicion."); *United States v. Caballero*, No. 15cr2738-BEN,

2016 WL 1546731, at * 6 (S.D. Cal. Apr. 14, 2016) ("Although *Riley*

could be applied to a cell phone search at the border, this Court is

bound by *Cotterman*[6]. . . . *Cotterman* is not clearly irreconcilable with

the reasoning . . . *Riley*, as evidenced by a number of courts finding that

*Riley* simply does not apply to cell phone searches at the border.");

*United States v. Hernandez*, No. 15-CR-2613-GPC, 2016 WL 471943, at

*3 (S.D. Cal. Feb. 8, 2016) ("[A]lthough the Court did hold in *Riley* that

the police generally may not, without a warrant, search digital

information on a cell phone seized from an individual incident to arrest,

---

[6] *United States v. Cotterman* was a pre-*Riley* decision in which the
Ninth Circuit held that only reasonable particularized suspicion is
required prior to conducting a deep "forensic examination" of a laptop
computer at the border.  709 F.3d 952, 963 (9th Cir. 2013), cert denied,
134 S. Ct. 899 (2014).  Prior to *Cotterman*, the Ninth Circuit had also
held in *United States v. Arnold* that a brief and nonintrusive search of a
laptop without suspicion or warrant was reasonable at the border.  533
F.3d 1003, 1009 (9th Cir. 2008).

the Court gave no indication that *Riley's* holding applied to the border search exception."); *United States v. Blue*, No. 1-14-CR-244-SCJ, 2015 WL 1519159, at *2 (N.D. Ga. Apr. 1, 2015) ("I conclude that the search here falls within the well-established parameters of a border search requiring no warrant. *Riley* . . . has no direct application to the circumstances presented here. Defendant likewise has cited no authority on point to support his position that the *Riley* reasoning changes the law of border search."); *Saboonchi*, 48 F. Supp. 3d at 818 ("[T]he [Supreme] Court gave every indication that its [*Riley*] holding was limited to searches incident to arrest and no indication that it intended to exempt cell phones form all warrantless searches.").

Consequently, the Court declines to extend *Riley* to searches of cell phones conducted at the border. Moreover, even if *Riley* were to affect the Court's analysis in any way, the only manner it would do so would be by implicating "the highest level of Fourth Amendment protection available," which pursuant to Fifth Circuit case law,[7] would

---

[7] In *Montoya de Hernandez,* the Supreme Court determined that the Fourth Amendment does not require a warrant, probable cause, or even reasonable suspicion for *routine* border searches and that the seizure of

19

require reasonable suspicion at the border—not probable cause or a warrant. *See Kolsuz*, 2016 WL 2658156, at * 11; *Saboonchi*, 48 F. Supp. 3d at 819.

Similar to the *Kolsuz* and the *Saboonchi* courts, the Court has not been able to find a single case "that stands for the proposition that more than reasonable suspicion is required for a nonroutine border search or seizure of any kind or extent." *See Kolsuz*, 2016 WL 2658156, at * 11; *Saboonchi*, 48 F. Supp. 3d at 819 ("Defendant has not cited to a single case holding that anything more than reasonable suspicion was required to perform a search of even the most invasive kind at the international border, and I have found none."); *Blue*, 2015 WL 1519159, at *2 ("At least where reasonable suspicion or probable cause is present,

---

a defendant for sixteen hours based upon reasonable suspicion was reasonable. 473 U.S. at 538, 541. The Supreme Court also clarified, however, that it was not deciding what level of suspicion is necessary for *nonroutine* border searches: "It is important to note what we do *not* hold. Because the issues are not presented today we suggest no view on what level of suspicion, if any, is required for nonroutine border searches such a strip, body cavity, or involuntary x-ray searches." 473 U.S. at 539 (emphasis in original).   Nevertheless, the Fifth Circuit has held that nonroutine border searches require only particularized reasonable suspicion.   *United States v. Kelly*, 302 F.3d 291, 294 (5th Cir. 2002).

20

customs officers will be on firm ground in searching cell phones and computers at the border."). "Indeed, even where physically intrusive body searches have been in issue, courts have consistently held that no more than reasonable suspicion is required." *See Kolsuz*, 2016 WL 2658156, at * 11.[8]

Nevertheless, the Court is sympathetic to Molina's arguments that a warrant should be required prior to conducting a search of a cell phone at the border. Molina cites to *Caballero*, a district court case originating in California and deciding the same issue, to support her argument. *See* Mot. 8–9 (citing *Caballero*, 2016 WL 1546731). In *Caballero*, the court stated that if it "were free to decide the question in

---

[8] Citing *United States v. Uricoechea-Casallas*, 946 F.2d 162, 166 (noting that a "reasonable suspicion" standard applies to a strip search at the border); *Rivas v. United States*, 368 F.2d 703, 710 (9th Cir. 1966) (holding that an alimentary canal search is a nonroutine border search that requires some particularized suspicion); *United States Vega-Bravo*, 729 F.2d 1341, 1349 (11th Cir. 1984) (holding that an x-ray is a nonroutine border search that requires reasonable suspicion); *United States v. Sanders*, 663 F.2d 1, 3 (2nd Cir. 1981) (holding that removal of artificial limb is nonroutine border search that requires some particularized suspicion); *see also Kelly*, 302 F.3d at 294 (stating that non-routine border searches such as body cavity searches, strip searches, and x-rays require only a particularized reasonable suspicion).

21

the first instance, it would hold that the warrantless cell phone search

[at the border] would be unreasonable." *Id.* at 5.

The *Caballero* court explained its rationale for its preferred

holding in the following manner:

> While, the Government's interest in preventing the entry of
> unwanted persons and effects is at its zenith at the
> international border, once unwanted drugs have been
> discovered and a person is arrested, it can be said that the
> Government has achieved its goal of discovery. A stopping
> and examining of persons and property crossing into this
> country has already taken place. Illicit narcotics have been
> discovered. Reasonable suspicion has jelled into probable
> cause. Any goal the Government might have of proceeding
> expeditiously to avoid delaying innocent travelers
> evaporates. There is no more need for agents to work
> expeditiously to return the digital device to the traveler so
> that he or she may be on their way. Agents may take their
> time to obtain a search warrant.

*Id.*

Yet, the *Caballero* court ultimately held that the defendant's

motion to suppress should be denied because it was bound by the

*Cotterman*[9] decision, which it held was not clearly irreconcilable with

*Riley*: "Because the cases are not clearly irreconcilable this [c]ourt is

bound by the . . . decision in *Cotterman*, which requires neither warrant

---

[9] *See supra* note 6 for a discussion of the *Cotterman* decision.

nor reasonable suspicion to justify a manual cursory search of a digital device being brought across an international border." *Id.* at 8.

Molina urges that her situation "mirrors' the one in *Caballero* but argues that unlike the *Caballero* court, which was bound by Ninth Circuit precedent, this Court is not bound by similar Fifth Circuit precedent regarding the search of technological devices at the border. *See* Mot. 9.

Were this Court free to decide this matter in the first instance, it might prefer that a warrant be required to search an individual's cell phone at the border. *See Caballero*, 2016 WL 1546731, at *5.[10]

_____

[10] Namely, the Court agrees with the *Caballero* court's analysis in recognizing that the need to conduct a warrantless search of a cell phone at the border dissipates once an individual has already been arrested and narcotics have been discovered. *See Caballero*, 2016 WL 1546731, at * 5.  The Court further agrees that officers may then take their time in obtaining a warrant in these situations. *See id.* Additionally, one of the rationales behind allowing even invasive body cavity searches at the border without a warrant or probable cause is to prevent individuals from brining illicit narcotics into the country. *See Montoya de Hernandez*, 473 U.S. at 537 ("[T]he Executive has plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, *in order to . . . prevent the introduction of contraband into this country*.") (emphasis added); *see also id.* at 538–39 ("These cases reflect longstanding concern for the protection of the integrity of the border.  This concern is, if anything,

However, the Court is not free to do so.  While Molina is correct that there is no Fifth Circuit precedent directly on point regarding the searches of cell phones or other similar technological devices at the border, the Fifth Circuit has consistently held that particularized reasonable suspicion is the highest standard required for border searches; the Court is not free to usurp decades of available legal precedent.[11]  The Court acknowledges that "[i]t may be that the

---

heightened by the veritable national crisis in law enforcement caused by smuggling of illicit narcotics, and in particular by increasing utilization of alimentary canal smuggling . . . . [which is] exceedingly difficult to detect.") (internal quotation marks and citations omitted); *see also Flores-Montano*, 541 U.S. at 153 ("That interest in protecting the borders is illustrated in this case by the evidence that smugglers frequently attempt to penetrate our borders with contraband . . . ."). Arguably, the same justification is not necessarily true for searching the contents on an individual's cell phone.  While individuals may attempt to hide illicit substances in their cellular devices, a physical inspection of the phone, and even physically taking the phone apart, would be sufficient to discover any illicit substance that may be contained inside the phone.  Yet, searching the contents of a cell phone does not seem to directly contribute to this justification for the border search exception—i.e., preventing the entry of unwanted illicit substances into the country.

[11] *See e.g., United States v. Sandler*, 644 F.2d 1163, 1166 (5th Cir. 1981); (requiring particularized reasonable suspicion for nonroutine border searches); *United States v. Rivas*, 157 F.3d 364, 367 (5th Cir. 1998)

24

'technology is different' rationale that led the *Riley* Court to treat an arrestee's cell phone differently from his wallet [in the country's interior] will one day lead the [Supreme] Court to treat" an individual's cell phone differently from other property at the border as well. *See Guerrero*, 768 F.3d at 360. However, until then, the Court will not "read tea leaves to predict possible future Supreme Court rulings," but rather will apply the applicable precedent at hand, which the Court holds remains unaffected by *Riley*. *See id.* at 361.

Thus, analyzing Molina's case under the current border search exception jurisprudence, the search of her cell phone was reasonable without a warrant, probable cause, or even reasonable suspicion if it was a routine border search. *See Montoya de Hernandez*, 473 U.S. at 538. Such a routine border search "require[s] no justification other than the person's decision to cross our national boundary." *Kelly*, 302 F.3d at 294. If, however, the search of her cell phone was a nonroutine border search, the officers were required to have a particularized reasonable suspicion before conducting the search. *Id.* The Court finds that it is

---

(same); *United States v. Smith*, 273 F.3d 629, 633 (5th Cir. 2001) (same).

25

unnecessary to decide whether the search of an individual's cell phone is a routine or nonroutine border search because, even if such a search is nonroutine, the search in this case was supported by reasonable suspicion.

"Reasonable suspicion entails some minimal level of objective justification that consists of more than inchoate or unparticularized suspicion or hunch, but less than the level of suspicion required for probable cause." *Smith*, 273 F.3d at 633–34.  Here, CBP officers discovered 4.32 kilograms of methamphetamine in Molina's suitcase. Joint Stipulation 2.  Consequently, they had reasonable suspicion to check the contents of her cellphone for further evidence of her criminal activity, and such a search was reasonable under the border search exception.  To be sure, Molina herself concedes that once illicit narcotics are found "reasonable suspicion has jelled into probable cause."  Mot. 9.

## IV.  CONCLUSION

After affording due consideration to Defendant's request for suppression, the Court finds that CBP officers had reasonable suspicion to conduct a cursory search of the contents of Molina's

cell phone.  Accordingly, the search was reasonable under the Fourth Amendment, and the evidence obtained as a result of that search are not subject to suppression.

Accordingly, **IT IS ORDERED** that Defendant Maria Isabel Molina-Isidoro's "Motion to Suppress" (ECF No. 16) is **DENIED**.

Signed this _____ day of **October, 2016.**

PHILIP R. MARTINEZ
UNITED STATES DISTRICT JUDGE

27